**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**ERICIA APOLINAR,**

    *Plaintiff,*

      v.

**LOAN SPOT** *doing business as*
**BLUE MOUNTAIN LOANS,**
**LEAD ENVY, LLC** *doing business as*
**TEKAMBI,**
**VELOCITY VENTURES GROUP,**
**LLC** *doing business as*
**INFINITY ENTERPRISE LENDING**
**SYSTEMS,**
**CLARITY SERVICES, INC.,**
*and*
**391 FINANCIAL, INC.,**

    *Defendants.*

Case Number:    8:24-cv-1706

**JURY TRIAL DEMANDED**

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, **Ericia Apolinar** ("**Ms. Apolinar**"), by and through her attorneys, Seraph Legal, P.A., and complains of the Defendants, **Loan Spot,** doing business as **Blue Mountain Loans** ("**Blue Mountain**"), **Lead Envy, LLC**, doing business as **Tekambi** ("**Tekambi**"), Velocity Ventures Group, LLC, doing business as **Infinity Enterprise Lending Systems** ("**Infinity**"), **Clarity Services, Inc.** ("**Clarity**"), and **391 Financial, Inc.** ("**391 Financial**") (collectively, the "**Defendants**"), stating as follows:

## PRELIMINARY STATEMENT

1.      This is an action brought by Ms. Apolinar against Blue Mountain only for violations of the *Electronic Funds Transfer Act,* 15 U.S.C. § 1693, *et seq.* ("**EFTA**"), against Blue Mountain, Infinity, and 391 Financial for violations of the *Florida Consumer Collection Practices Act*, § 559.55, Fla. Stat., *et seq.* ("**FCCPA**"), and against all Defendants for violations of the *Racketeer Influenced and Corrupt Organizations Act,* 18 U.S.C. § 1961, *et seq.* ("**RICO**").

## JURISDICTION AND VENUE

2.      Subject matter jurisdiction arises under the EFTA, 15 U.S.C. § 1693m(g), RICO, 18 U.S.C. § 1965, the FCCPA, § 559.77(1), Fla. Stat., and § 34.01, Fla. Stat.

3.      This Court has supplemental jurisdiction for Plaintiff's FCCPA claims under 28 U.S.C. § 1367.

4.      The Defendants are subject to the provisions of this Court pursuant to § 48.193, Fla. Stat. and Fed. R. Civ. P. 4(k).

5.      Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391(b)(2), because the acts complained of were committed and/or caused by the Defendants within the Middle District of Florida.

## PARTIES

### Ms. Apolinar

6.      **Ms. Apolinar** is a natural person residing in Polk County, Florida.

7.      Ms. Apolinar is a *Consumer* as defined by the FCCPA, § 559.55(8), Fla. Stat.

## Blue Mountain

8.      **Blue Mountain** is chartered pursuant to the laws of the Kashia Band of Pomo Indians of the Stewarts Point Rancheria (the "**Tribe**"), a federally recognized Indian nation.

9.      Blue Mountain claims to be a wholly owned economic arm and instrumentality to the Tribe.

10.     Blue Mountain can be served at Kashia Band of Pomo Indians Tribal Office, 1420 Guerneville Rd., #1, Santa Rosa, CA 95403.

11.     Blue Mountain issues loans to consumers online through the website www.bluemountainloans.com.

## Tekambi

12.     **Tekambi** is a Delaware limited liability company with a principal business address of 23150 Fashion Drive, Suite T242, Estero, FL 33928.

13.     Tekambi is registered to conduct business in the State of Florida, where its registered agent is **Corporate Creations Network Inc., 801 US Highway 1, North Palm Beach, FL 33408**.

## Infinity

14.     **Infinity** is a business which operates at 4864 Sparks Blvd., Sparks, NV 89436.

15.     The registered agent in Nevada for Infinity is **Corporate Creations Network Inc., 8275 South Eastern Avenue, #200, Las Vegas, NV 89123.**

## Clarity

12.     **Clarity** is a Delaware corporation with a principal business address of 475 Anton Blvd., Costa Mesa, CA 92626.

13.     Clarity is registered to conduct business in the State of Florida, where its registered agent is **CT Corporation System, 1200 South Pine Island Rd., Plantation, FL 33324**.

## 391 Financial

14.     **391 Financial** is a Missouri corporation with a primary address of 4013 Frontgate Dr., Columbia, MO 65203.

15.     The Missouri registered agent for 391 Financial is **Clay B. Bethune, 5522 Prairie Creek, Columbia, MO 65203.**

## FACTUAL ALLEGATIONS

### Blue Mountain Loans Makes Unlawful Loan to Plaintiff

16.     On or around June 13, 2024, Blue Mountain made a $400 loan to Ms. Apolinar (the "**Loan**") through bluemountainloans.com. **SEE PLAINTIFF'S EXHIBIT A.**

17.     The Loan had a stated annual percentage rate ("APR") of 484.29%. ***Id.***

18.     The Loan required Ms. Apolinar to repay a total of $1,687.76 on a $400 loan.

19.     Blue Mountain transferred the proceeds of the Loan through the ACH network into Ms. Apolinar's checking account which she maintained in Polk County, Florida.

20.     Shortly after the Loan was taken out, Blue Mountain began debiting Ms. Apolinar's checking account via the ACH network and withdrawing bi-weekly payments.

21.     Payments made by Ms. Apolinar were applied entirely (or almost entirely) as interest by Blue Mountain, with nothing or almost nothing credited to principal.

22.     The State of Florida has long recognized that lending money at usurious interest rates is immoral, harmful, and contrary to public policy.

23.     § 687.02(1), Fla. Stat., renders any loan usurious which is made at an interest rate greater than 18% per year.

24. § 687.071(3), Fla. Stat., renders loans made with annual interest rates greater than 45% a third-degree felony.

25. § 687.071(7), Fla. Stat., renders any criminally usurious loan void and unenforceable.

26. Long-standing public policy in Florida confirms the impossibility of the alleged debts. *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935) (criminally usurious loans are "void as against the public policy of the state as established by its Legislature.")

27. Any person who willfully makes a criminally usurious loan, in addition to subjecting themselves to criminal sanctions, forfeits the right to collect payment for the loan. *Id.*

28. Indeed, even the recovery of the principal balance made at usurious rates is impermissible under Florida law. *Rollins v. Odom*, 519 So. 2d 652, 656 (Fla. Dist. Ct. App. 1988).

29. The purpose of the usury statutes is to protect the needy borrower by penalizing the unconscionable money lender. *Stubblefield v. Dunlap*, 148 Fla. 401, 4 So.2d 519 (1941); *see also Pushee v. Johnson*, 123 Fla. 305, 166 So. 847 (1936); *River Hills, Inc. v. Edwards*, 190 So.2d 415 (Fla. 2d DCA 1966).

30. Florida has taken usury one step further in the consumer loan context through the passing of the Consumer Finance Act, § 516, Fla. Stat. (the "Act").

*31.*    The Act requires licensure and state oversight for lenders issuing loans to Florida consumers in the amount of $25,000 or less. *§ 516.02(1), Fla. Stat.*

32.    The Act further restricts the interest and fees which may be charged by a licensed consumer finance company.

33.    § 516.02(c), Fla. Stat., indicates that any loan which fails to comply with the Act is unenforceable in Florida *even if valid wherever made.*

34.    Thus, Florida has made clear that in order to enforce a consumer loan against a Florida resident, a lender must be licensed in Florida and comply with the Consumer Finance Act.

35.    None of the Defendants are licensed as a Consumer Finance Company in Florida.

36.    The Loan is thus unenforceable against Ms. Apolinar, regardless of whether it is valid under tribal law or wherever else it may have been made.

37.    Further, because the Loan is subject to an interest rate greater than 45%, which exceeds the limit as proscribed in § 678.071(3), Fla. Stat., the Loan's balance is void *ab initio* and unenforceable in Florida, pursuant to § 687.071(7), Fla. Stat.

38.    The balance relating to the Loan is therefore an *unlawful debt* pursuant to 18 U.S.C. § 1961(6).

39.     The proceeds from the Loan were used by Ms. Apolinar for the purchase of goods and services for personal, family, or household purposes, and thus the Loan meets the definition of *Debt* under the FCCPA, § 559.55(6), Fla. Stat.

40.     Blue Mountain made multiple collection communications to Ms. Apolinar, via e-mail, and text message.

41.     Blue Mountain, directly or via service providers, reported the Loan to Clarity, a nationwide *consumer credit reporting agency* ("CRA"). **SEE PLAINTIFF'S EXHIBIT B.**

42.     By reporting the Loan to a CRA, Blue Mountain certified that the Loan was a legally valid debt, which it was not.

43.     Blue Mountain reported an illegal, unenforceable debt to the CRAs in order to hold Ms. Apolinar's credit report hostage, thereby ensuring payment of the usurious loan.

44.     As a result of Blue Mountains actions, Ms. Apolinar was strong-armed into paying the Loan; had she not done so, her credit reports and scores would be adversely impacted.

### Rent-A-Tribe Schemes

45.     Blue Mountain is purportedly owned by the Tribe.

46.    In reality, the Tribe has virtually nothing to do with the operation of the lending business and simply participates in what is often referred to as a "rent-a-tribe" scheme.

47.    In such a scheme, non-tribal payday lenders attempt to circumvent state usury laws by invoking the sovereign immunity available to Native American tribes.

48.    While the non-tribal entities operate all substantive aspects of the business such as funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections for the high-interest loans, the tribe acts as a label or figurehead in exchange for what is often a relatively insignificant portion of the revenue generated.

49.    Supposedly, Blue Mountain Financial operates under a lending license granted by the Kashia Tribe, beholden only to the Kashia Tribe's own "lending commission ordinance."

50.    The ordinance – "Ordinance #12" – was approved by the Kashia Tribe on August 10, 2013, right before the Kashia Tribe began its first of what would become many "rent-a-tribe" schemes.

51.    The Kashia Tribe is a small, isolated, financially-strapped Native American tribe with approximately 78 members living on its reservation.

52.     Supposedly, the Kashia Tribe operates over a dozen different online lending websites – all of which make small-dollar, short-term loans at interest rates exceeding 500% –including Evergreen Cash, Redwood Coast Finance, Spring Water Finance, Pave Credit, and others.

53.     In total, the Kashia Tribe's lending enterprises would presumably make tens of millions of dollars of loans per year and require hundreds of employees to staff.

54.     The Kashia Tribe claims to operate from offices located at 1420 Guerneville Road, Suite 1, Santa Rosa, CA 95403; the office is located in the Coddingtown Plaza Business Park, is roughly 1,000 square feet and serves as the offices of the tribal government overseeing road work, construction, and other services.

55.     The Kashia Tribe's "lending commission ordinance" does not require a person obtaining a license to be a Tribal member, nor does it require any particular percentage or revenue to be retained by the Tribe.

56.     In addition to being in violation of Florida law, the Loan made by Blue Mountain Financial does not appear to even be legal under the Tribe's own lending ordinance.

57.     For example, Part V, "Operational Requirements and Limitations on Lending Business Activities," paragraph B, sub-paragraph 2, "Consumer Loan

Amounts; Fees and other Charges," states "No lender licensee may charge fees, interest or other consideration for the granting of a consumer loan that exceeds $40 per $100 lent." **SEE PLAINTIFF'S EXHIBIT C.**

58.    The Loan made to Ms. Apolinar charges over $320 in fees per $100 lent.

59.    The Loan made to Ms. Apolinar was intended to be repaid over 40 weeks, as the payment schedule emailed to her makes clear; yet, according to the Tribe's ordinance, Part V, "Operational Requirements and Limitations on Lending Business Activities," paragraph B, sub-paragraph 3, "Loan Terms; Repayment; Extensions," states "(t)he initial term of each consumer loan granted by a Lender Licensee shall be at least 3 days *but no more than 45 days*." (Emphasis added.) *Id.*

60.    Ms. Apolinar has never set foot on tribal land or visited Santa Rosa, California.

61.    Ms. Apolinar took the loan out from her home in Florida, had the proceeds wired to her checking account she maintains in Florida, signed all relevant documents in Florida, received loan communications in Florida, and had payment debited from her checking account at a Florida bank, and was facilitated by from a web server located in a Cloudfare data center in or around Missouri.

62.     Having no nexus with the Tribe or its land, and having been obtained, funded, and paid in Florida, Ms. Apolinar's Blue Mountain Loan occurred in Florida and is governed by the laws of the State of Florida.

63.     Moreover, sovereign immunity does not turn an otherwise illegal loan into a legal one; at best, it potentially creates a defense to criminal or civil prosecution of the crime. See, e.g., *United States v. Neff*, No. 18-2282 (3d Cir. Sep. 6, 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

64.     Where a consumer is located when they press "submit" via an online portal with a Native American tribe determines where the transaction takes place for jurisdictional purposes.[1]

65.     As such, the loan made to Ms. Apolinar by Blue Mountain Loans was criminally usurious, void, unenforceable and an unlawful debt.

## Blue Mountain Loans is a Racketeering Conspiracy

66.     None, or virtually none, of Blue Mountain's business is conducted on the Tribe's reservation.

---

[1] *California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960, 968 (9th Cir. 2018) ("However, the patrons' act of placing a bet or wager on a game of DRB while located in California constitutes gaming activity that is not located on Indian lands, violates the UIGEA, and is not protected by IGRA.")

67.     Rather, all essential business operations are performed in other locations outside of the Tribe's jurisdiction, including Missouri.

68.     Off-reservation business operations, comprising substantially all of the company's functions, are conducted by and for the benefit of non-tribal members and investors.

69.     These operations include incoming and outgoing phone calls and emails, review of loan applications, loan underwriting, payment processing, website maintenance and marketing.

70.     Blue Mountain is beneficially owned and operated by 391 Financial, and 391 Financial receives the overwhelming percentage of profits generated.

71.     BlueMountainLoans.com, first registered in August 2021, was essentially a copy-and-paste job created from AmericasCashAdvanceInc.com, a website registered in 2010 and operated by 391 Financial since that time.

72.     AmericasCashAdvanceInc.com is the website of America's Cash Advance, a lending business owned and operated by 391 Financial and which makes loans to consumers at interest rates as high as 790% annually[2].

73.     The text and layout of both websites are substantially the same; for example, both websites are titled "Apply for a cash loan online. We are a direct lender."

---

[2] See https://americascashadvanceinc.com/, accessed July 15, 2024

74.     The home page of both prominently features the phrase "QUICK LOANS FROM $100 to $1,200, 3 simple steps to get the funds you need."   **SEE PLAINTIFF'S EXHIBITS D & E.**

75.     Both home pages feature the same "How It Works" section with identical language other than the phone number, including "You will receive a call within 15 minutes after completing the steps above. We can be reached at [phone number] for any assistance that may be needed." **SEE PLAINTIFF'S EXHIBITS D & E.**

76.     The "application information" and "why us" sections are identical, other than the name of the particular lender changing.

77.     The "FAQ" (frequently asked questions) page of both websites contains the identical 18 questions and answers, presented in the same order, with utilizing the same text and language (other than the name of the lender changing).

78.     Moreover, the IPv4 address of americascashadvanceinc.com is 104.21.35.160, which is a server hosted by Cloudfare, Inc.; the IPv6 address is 2606:4700:3032::6815:23a0.

79.     The IPv4 address of bluemountainloans.com is 104.26.10.85, which is also a server hosted by Cloudfare, Inc.; the IPv6 address is 2606:4700:20::681a:b55.

80. Thus, the IPv6 addresses of both begin with 2606:4700, meaning they are both not only hosted by Cloudfare, Inc. but hosted in the same physical data center.

81. 391 Financial raises cash from individual accredited investors, paying them between 11% to 13% annual interest. *See* https://www.391financial.com, accessed July 15, 2024.

82. 391 Financial informs prospective investors that funds placed with it for investment are used to finance short-term, high interest, small-dollar consumer loans, stating in part "Our interest rates are designed to compensate for the loans that go into default and are never repaid. It is a high risk/high reward business; thus, we have to charge higher interest rates to compensate for the defaults and the small loan amounts. Our investors' interest rate is a fixed amount and is not tied to the performance of individual loans."

83. In response to an FAQ "Do the usury laws apply?" (SIC), 391 Financial states "No. In most states usury laws typically apply to mortgages, but not small consumer loans. States allow high rates on small consumer loans due to the economics of this market. This allows lenders to serve this market profitably."

84. This statement is demonstrably false, as the overwhelming majority of states, including Florida, do have usury statutes which apply to small-dollar consumer loans.

85.     391 Financial also tells investors "We obtain licensing and follow each state law that we operate in," even though it makes loans via Blue Mountain Loans in Florida, a state it has no lending license of any kind in.

86.     391 Financial claims to be part of FFG, LLC, which does business as FinTech Finance Group.

87.     The website of FinTech Finance Group notes defendant Clarity is one of its "integration partners."[3]

88.     FinTech Finance Group's Vice President is Blake Richter, who was previously the Vice President of Operations for Plain Green, LLC.[4]

89.     Plain Green operated under a rent-a-tribe scheme similar to that of Blue Mountain Loans; Plain Green "is a payday lending entity cleverly designed to enable [] Defendants to skirt federal and state consumer protection laws under the cloak of tribal immunity. That immunity is a shield, however, not a sword . . . Tribes and their officers are not free to operate outside of Indian lands without conforming their conduct in these areas to federal and state law." *Gingras v. Think Finance, Inc.*, 922 F.3d 112, 128 (2d Cir. 2019).

90.     391 Financial has a related entity called FinTech Call Center, which provides call center services for lending operations such as Blue Mountain Loans.

---

[3] See https://www.fintechfinance.io/, accessed July 15, 2024.
[4] https://www.fintechfinance.io/about-us, accessed July 15, 2024

## Infinity and Payday Loan Manager

91.   Infinity is a "back-end" services vendor that provides software to analyze, underwrite, service, and collect payday loans.

92.   Infinity states that its software "can support your vision… and your success. We have built the industry's best solution for Payday loan management. Our Business Rules Engine will meet your exact lending model and grow along with you. Schedule ACH transactions and reminder messages for automatic payment processes. Follow-up reminders will keep your CSR's on-task when working customer accounts. Refinancing a loan is as easy as clicking a button. Infinity is built to manage your Payday loan product no matter where you are lending."

93.   Payday Loan Manager is software for operating a payday lending website, including "an integrated ACH provider that automatically handles the crediting and debiting of your loans."

94.   Infinity's website, infinitysoftware.com, as well as paydayloanmanager.com, are hosted on servers owned or managed by Infinity, with an IP address of 169.55.60.156. **SEE PLAINTIFF'S EXHIBIT F.**

95.   More than 100 different payday lending websites are hosted by Infinity on the same server, many of which claim sham "tribal" affiliations.

96.    Infinity's website even features testimonials from non-tribal individuals who are, nonetheless, listed as owners or executives of ostensibly "tribal" payday lenders.

97.    One such testimonial is from Dustin A. Dernier ("**Dernier**"), who is identified as "CEO 605 Lending." **SEE PLAINTIFF'S EXHIBIT G.**

98.    Dernier states, "The Infinity Team has helped us grow our start up into something to be very proud of. The entire team has been there for us *every step of the way*." (*Emphasis added*.) *Id.*

99.    Another testimonial is from John Humphrey ("**Humphrey**"), identified as "COO DMP Investments." **SEE PLAINTIFF'S EXHIBIT H**.

100.    DMP Investments LLC is owned by the Texas payday loan magnate William C. Pruett ("**Pruett**"), who operates numerous payday lending businesses, including several operated under a "rent-a-tribe" model, including Sky Trail Cash, supposedly owned by the Lac du LDF Tribe in rural Wisconsin. It makes loans to consumers in many states, including Florida, at interest rates exceeding 700% annually.

101.    Humphrey lavishes praise on Infinity, stating, "Your software platform provided the ideal mix of processing capacity, high availability, and resource scalability that each proved vital components throughout our implementation. We sincerely appreciate the relationship with our friends at

Infinity Software and consider their software platform an indispensable resource in operational landscape." *Id.*

102.   Infinity's website features a video touting how its software features "end-to-end loan process automation" and can "automate the loan collection process for maximum results."

103.   Thus, not only does Infinity provide the "brains" behind Blue Mountain's illegal payday loans – providing and managing the software which underwrites and collects loans, including the Loan made by Blue Mountain to Ms. Apolinar in Florida – the software also managed the initiation of the ACH transactions to and from Ms. Apolinar's checking account. The software was stored and ran on servers belonging to Infinity and accessed by Blue Mountain management. Infinity's software and infrastructure is, essentially, the engine driving the illegal loansharking racket.

104.   Infinity received a portion of the profits made off the astronomically high, illegal interest rates charged to Ms. Apolinar. Infinity knew that its software was facilitating loansharking, and that by providing technology to Blue Mountain specifically designed to facilitate loansharking, illegal loans were being made to Florida residents such as Ms. Apolinar.

105.    Infinity frequently purchases consumer credit reports from Clarity, a subsidiary of Experian Information Solutions, Inc. ("**Experian**"), which is based in Clearwater, Florida.

106.    When purchasing credit reports on behalf of lenders, Infinity's name often appears along with the tribal lender's name and the non-tribal beneficial owner of the enterprise. The following is an inquiry for Ms. Apolinar's credit report from Clarity:

| 6/12/2024  6:19:24 pm EDT bfrjce30n4 | Credit Application | Online Installment Loan | Blue Mountain Loans-Infinity-Lead Envy-FT Services |
|---|---|---|---|

**SEE PLAINTIFF'S EXHIBIT I.**

107.    Another example shows Infinity's name in requesting a report concerning RapidLoanNow.com, supposedly owned by the Oglala Sioux Tribe in South Dakota, but beneficially operated by Bart Miller, a Kansas City businessman who has operated online payday lenders since the early 2000s and now owns Centrinex:

| 9/21/2020 10:34:08 am EDT 6x39nzdn9g | Credit Application | Online Installment Loan | Rapid Title Loans/DPS/Infinity/Centrinex |
|---|---|---|---|

108.   Infinity provides services to a substantial number of online lenders based in Florida, including the Miami-based SkyCashUSA.com[5], an unlicensed Florida lender which makes loans to consumers at interest rates exceeding 700%.

109.   Infinity also provides ongoing services to the Palm City, Florida-based Dean Financial Group LLC, which operates the website CashAisle.com and CashAisle.net. Cash Aisle makes loans to consumers at over 700% annual interest.

110.   Not only does Infinity have key business relationships and a considerable number of clients in Florida, it also advertises its services to online lenders in Florida and seeks to serve the Florida market, thus subjecting it to the jurisdiction of a Florida court. See *Avicolli v. BJ's Wholesale Club, Inc.*, 2021 WL 3471167, at *3 (E.D. Pa. Aug. 6, 2021) (holding a "defendant is properly subject to jurisdiction in a state where it seeks to serve that state's market.")

## Tekambi's Role in the Enterprise

111.   A key component to a successful online loansharking business is the identification of consumers who are willing to take out triple-digit interest rate loans and also have the financial means to repay such loans.

112.   To automate this process, lenders making short-term, high-interest online payday loans often utilize outside service contractors to help them cost-

---

[5] The lender and its owner, Efrain Betancourt, were sued by the Securities and Exchange Commission in 2021. The SEC alleged Sky Cash USA was a $66 million Ponzi scheme; Bentancourt used most of the money to fund a lavish lifestyle that included a Miami waterfront condo and a wedding to his fourth wife in Monaco. *SEC: Payday loan scheme bilks investors out of millions,* The Associated Press, December 28, 2021.

effectively purchase leads, analyze those leads, and then underwrite the loan if the lead elects to apply for a loan.

113.   Tekambi advertises itself on its website as "the smartest way to manage lead data" and trumpets that "Tekambi's unique lender solutions optimize the lender / borrower lifecycle." *See* https://tekambi.com/, accessed November 21, 2022.

114.   Tekambi's services include "loan origination and decisioning, underwriting and fraud prevention, customer management, and collections and debt management. *Id.*

115.   According to its March 1, 2022, press release, Tekambi is "a customer-focused online lead management system for alternative credit lenders. With reliability and flexibility at its core, Tekambi is a robust plug-and-play solution that changes the way lenders manage their marketing campaigns and lead filtering process." Press Release, GlobeNewswire, Aquila expands across lending vertical with acquisition of Tekambi (March 1, 2022). https://www.globenewswire.com/en/newsrelease/2022/03/01/2394530/0/en /Aquila-expands-across-lending-vertical-with-acquisition-of-Tekambi.html.

116.   As part of the lead-generation and underwriting process, Tekambi obtained consumer credit reports on Ms. Apolinar from Clarity.

117.    The Clarity record inquiries from Blue Mountain as being requested by "Blue Mountain Loans-Infinity-Lead Envy-FT Services."

118.    Thus, Tekambi was involved in obtaining credit bureau reports on Ms. Apolinar, and it also played a role in determining that Ms. Apolinar should be offered a loan, for how much, and under what terms.

119.    Tekambi knows that interest rates like those charged by Blue Mountain are illegal under Florida law.

120.    Tekambi actively promotes its software at trade gatherings catering to customers, and potential customers, who make online loans at triple-digit interest rates, including the "Tribal Lending Summit" held in August 2022 in Lac du Flambeau, Wisconsin.

121.    Indeed, Tekambi was one of the premium sponsors of the Tribal Lending Summit.

122.    By actively promoting its software and services at venues exclusively devoted to online lending at 600%+ interest rates, Tekambi not only knows its products will be used for unlawful purposes, but actively encourages online loansharks to use its wares.

123.    Moreover, with respect to Ms. Apolinar's Loan, Tekambi knew: (a) she was a Florida resident, (b) the interest rate exceeded 400%, and, (c) the Loan was funded by Blue Mountain, and not a tribal entity.

124.    With this knowledge, Tekambi provided services to the Blue Mountain racketeering conspiracy and was paid for such services.

**<u>Clarity Knowingly Facilitates Loansharking</u>**

125.    Clarity is a nationwide CRA which primarily services the needs of online payday lenders like Blue Mountain Loans – *e.g.*, lenders making short-term, small-dollar loans at triple-digit interest rates.

126.    Clarity maintains terabytes of proprietary data specifically tailored to assist online, subprime lenders in evaluating potential borrowers, including consumers' checking account histories, employment and salary data, and past payday loan experiences.

127.    Clarity then supplements this data with information from its parent company, Experian, one of the "Big 3" nationwide CRAs, as well as with data from other specialty CRAs, including Chex Systems.

128.    Clarity merges its own data with that obtained from Experian and Chex Systems into one report, which it then sells to online lenders.

129.    Indeed, on June 12, 2024, the date Ms. Apolinar applied for her Loan from Blue Mountain, Clarity sold a consumer report regarding Ms. Apolinar to Blue Mountain. ***Id.***

130.   Clarity's consumer report regarding Ms. Apolinar was obtained by non-tribal service providers, including Infinity and Tekambi, among other entities, acting on behalf of Blue Mountain.

131.   Clarity has extensive policies in place to conduct due diligence on potential new customers, which includes, in most cases, sending an investigator to the primary business office of the lender.

132.   In situations where a lender is "tribally" owned but obtains consumer reports through a non-tribal service provider, Clarity typically sends its investigator to the offices of the service provider, *e.g.*, to the offices of Infinity in Nevada not to the Tribe's reservation in California, where no lending office exists.

133.   Clarity also examines the states the lender does business in, and the lender's website, including pages which show the interest rates, terms, and fees assessed.

134.   Clarity has had numerous lawsuits filed against it concerning its provisioning of credit reports to online payday lenders with sham tribal affiliation, like Blue Mountain.

135.   Clarity has also produced several detailed reports for the online lending industry, such as its 2019 *Alternative Financial Services Lending Trends Insights into the Industry and its Consumers*, which it stated analyzed 350 million

loan applications and 25 million loans. Most of the loans were small-dollar, short-term loans made by online lenders.

136.   Clarity thus knew, when furnishing a consumer report regarding Ms. Apolinar, that the data it was providing was in connection with the making of a loan at a triple-digit interest rate.

137.   Clarity's assistance in Blue Mountain's "rent-a-tribe" scheme is of critical importance, as is that of Tekambi and Infinity.

138.   Absent the trove of data Clarity knowingly supplied for use by Blue Mountain, no such loan could have, or would have, been made to Ms. Apolinar.

139.   Likewise, without access to the ACH system, or strong underwriting analytics, the Blue Mountain racketeering enterprise also would have disintegrated.

140.   Beyond this, Clarity accepts tradeline data from Blue Mountain, which data includes loan amounts, payments due, and payment history.

141.   Indeed, Blue Mountain, or its service provider, reported Ms. Apolinar's Loan to Clarity.

142.   Blue Mountain reported to Clarity that Ms. Apolinar's Loan was in the principal amount of $400, opened on June 13, 2024, with a first due date of June 29, 2024. **SEE PLAINTIFF'S EXHIBIT B.**

143.   Clarity spends what is likely hundreds of thousands of dollars each year promoting itself and its services directly to online lenders like Blue Mountain.

144.   For example, Clarity was a "Gold Level" sponsor of the OLA 2022 Tribal Lending Conference; one of its employees, Paul Mitchell, a Senior Account Executive, was also a speaker at the conference and gave insights into what kind of consumers are likely to look for, and accept the terms of, with "tribal" payday lenders.

145.   Clarity also periodically receives disputes from consumers about Blue Mountain tradeline data, alleging the loans are usurious and unenforceable.

146.   For years, courts have recognized the power of credit reporting to procure payment. A creditor's "ability to report on the credit habits of its customers is powerful tool designed, in part, to wrench compliance with payment terms." *Rivera v. Bank One*, 145 F.R.D. 614, 623 (D.P.R. 1993).

### <u>Blue Mountain Violates EFTA by Requiring Electronic Payment</u>

147.   Ms. Apolinar was required to provide her bank routing and account number or debit card number when she applied for the Loan.

148.   Blue Mountain will not allow an application for credit to proceed without the consumer supplying bank account information.

149.   When Ms. Apolinar was approved for the Loan, she was provided with a "payment authorization" to electronically sign along with other electronic documents.

150.   The "payment authorization" gives consent to Blue Mountain to initiate ACH debits from her account (or debit card) to make the required bi-weekly loan payments.

151.   While couched as voluntary, Blue Mountain will not approve a loan application which does not contain a signed, "voluntary" electronic payment agreement.

152.   While a consumer like Ms. Apolinar can elect to terminate the electronic payment agreement, such actions can be taken only *after* the loan is originated.

153.   Blue Mountain's business model of making unsecured subprime consumer loans is heavily predicated on being able to debit loan payments automatically on a bi-weekly basis – typically the schedule most consumers are paid their wages.

154.   The EFTA "protects consumers by providing a 'basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund transfer systems.'" *Bass v. Stolper, Koritzinsky, Brewster & Neider, S. C.*, 111 F.3d 1322, 1328 (7th Cir.1997) (quoting 15 U.S.C. § 1693(b)).

155.     "No financial institution or other person may condition an extension of credit to a consumer on the consumer's repayment by preauthorized electronic fund transfers...." 12 C.F.R. § 205.10(e)(1). *See also* 15 U.S.C. § 1693k(1).

156.     Thus, despite the ostensibly "voluntary" electronic payment agreement, in reality, Blue Mountain conditioned the Loan on Ms. Apolinar, like all other consumers it serves, providing consent to ACH debits or debit card payments.

157.     The fact that the agreement can be modified or altered after execution does not mean Blue Mountain complied with the EFTA.

158.     Violation of 15 U.S.C. § 1693k(1) occurs at the moment the lender conditions electronic funds transfers. *See De La Torre v. CashCall, Inc.*, 56 F. Supp. 3d 1105, 1107-09 (N.D. Cal. 2014); *Federal Trade Commission v. Payday Financial LLC*, 2013 WL 5442387, at *8-9 (D. S.D. Sept. 30, 2013).

159.     At all times relevant, all of the Defendants sought to serve the Florida market, as did Blue Mountain.

160.     Therefore, the Defendants are subject to the jurisdiction of a Florida court. *See Avicolli v. BJ's Wholesale Club, Inc.*, 2021 WL 3471167, at *3 (E.D. Pa. Aug. 6, 2021) (holding a "defendant is properly subject to jurisdiction in a state where it seeks to serve that state's market.")

## **Defendants Violate RICO**

161.    Federal law, the Racketeer Influenced Corrupt Organizations Act ("RICO"), defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

162.    In *Boyle v. United States*, the Supreme Court recognized that RICO's definition of enterprise was "obviously broad" and included an "association in fact" enterprise. 556 U.S. 938, 944 (2009).

163.    Thus, an enterprise may be a legally recognized entity like a corporation or an "association in fact enterprise," *i.e.*, "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981); *Boyle*, 556 U.S. at 948 ("[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose.")

164.    Here, Blue Mountain, Infinity, Tekambi, Clarity, 391 Financial (and its related entities) are an *association in fact enterprise* who are associated together for the common purpose of making, collecting, and profiting from illegal loans, in some cases directly, and in others indirectly (*i.e.,* by receiving inflated fees for the provision of services like ACH access).

165.    Ms. Apolinar has made a payment to Blue Mountain for the null, void, and unenforceable loan made to her.

166.    Ms. Apolinar has been damaged in that she has paid one or more of the Defendants for a loan that was void and criminally usurious pursuant to Florida law.

167.    Ms. Apolinar also suffered emotional distress as a result of the Defendants' attempts to collect an unenforceable debt.

168.    Ms. Apolinar has hired the aforementioned law firm to represent her in this matter and has assigned her right to fees and costs to such firm.

## COUNT I
## BLUE MOUNTAIN, 391 FINANCIAL, & INFINITY'S VIOLATIONS OF THE FCCPA, § 559.72(9), FLA. STAT.

169.    Ms. Apolinar adopts and incorporates Paragraphs 1 – 171 as if fully restated herein.

170.    Blue Mountain, 391 Financial, and Infinity violated **§ 559.72(9), Fla. Stat.**, when they attempted to collect – and did collect – a loan made to Ms. Apolinar by Blue Mountain, therein asserting the legal right to collect such loan.

171.    The Loan was illegitimate and unenforceable due to the application of interest rates in excess of 500% annually on the principal amount of the loan, in violation of § 687.071, Fla. Stat., and the Defendants knew, or should have known, the loan was unenforceable in Florida.

172.    The actions of Blue Mountain, 391 Financial, and Infinity were willful, intentional, and done for the express purpose of collecting an unenforceable debt from Plaintiff and profiting from such collection.

173.    Blue Mountain, 391 Financial, and Infinity each knew of the illegal nature of the Loan, as the Defendants have gone to great lengths to attempt to avoid Florida law through use of a "rent-a-tribe" scheme.

**WHEREFORE,** Ms. Apolinar respectfully requests this Honorable Court enter judgment against Blue Mountain, 391 Financial, and Infinity, jointly and severally, ordering:

a.  Statutory damages of **$1,000.00**, pursuant to § 559.77(2), Fla. Stat.;

b.  Actual damages, pursuant to § 559.77(2), Fla. Stat.;

c.  Injunctive relief preventing the Defendants from attempting to collect alleged loan balance from Ms. Apolinar made at unlawful rates, pursuant to § 559.77(2), Fla. Stat.;

d.  Reasonable costs and attorney's fees pursuant to § 559.77(2), Fla. Stat.; and,

e.  Such other relief that this Court deems just and proper.

## COUNT II
## DEFENDANTS' JOINT & SEVERAL VIOLATIONS OF
## RICO, 18 U.S.C § 1962(a)

174.    Ms. Apolinar adopts and incorporates Paragraphs 1 – 171 as if fully restated herein.

175.    The Defendants, through their joint operation and control of Evergreen, constitute an "enterprise" as defined by 18 U.S.C. § 1961(4).

176.    The Loan charged an interest rate far in excess of Florida's maximum permitted rate, and thus the Loan was an "unlawful debt" pursuant to 18 U.S.C. § 1961(6).

177.    The Defendants violated **18 U.S.C § 1962(a)** when they received proceeds directly or indirectly from the collection of an unlawful debt – Ms. Apolinar's Loan – and utilized such proceeds to maintain the ongoing lending enterprise.

178.    The Defendants utilized the internet, telephone and mail to reach across state lines in operating the lending enterprise, including through collection calls, obtaining consumer credit reports, and ACH withdrawals and deposits to and from consumer bank accounts, including Ms. Apolinar's.

179.    The Defendants' business model readily acknowledges the illegal nature of the Loan, and goes to great lengths to obfuscate how, and by whom, the Loan was made, attempting to deceive consumers into believing that they have no legal recourse against its enforcement.

**WHEREFORE,** Ms. Apolinar respectfully requests this Honorable Court enter judgment against the Defendants, jointly and severally, ordering:

a.      Threefold the amount of actual damages;

b.      Reasonable costs and attorneys' fees pursuant to 18 U.S.C § 1964(c);

c.      Any other relief this Court deems equitable and proper under the circumstances.

## COUNT III
## DEFENDANTS' JOINT & SEVERAL VIOLATIONS OF
## RICO, 18 U.S.C § 1962(b)

180.    Ms. Apolinar adopts and incorporates Paragraphs 1 – 171 as if fully restated herein.

181.    The Defendants, through their joint operation and control of Blue Mountain Loans, constitute an "enterprise" as defined by 18 U.S.C. § 1961(4).

182.    The Loan charged an interest rate far in excess of Florida's maximum permitted rate, and thus the Loan was an "unlawful debt" pursuant to 18 U.S.C. § 1961(6).

183.    The Defendants violated **18 U.S.C § 1962(b)** when they received proceeds directly or indirectly from the collection of an unlawful debt – Ms. Apolinar's Loan – and utilized such proceeds to maintain the ongoing lending enterprise.

184.    The Defendants utilized the internet, telephone and mail to reach across state lines in operating the lending enterprise, including through collection calls, obtaining consumer credit reports, and ACH withdrawals and deposits to and from consumer bank accounts, including Ms. Apolinar's.

185.    The Defendants' business model readily acknowledges the illegal nature of the Loan, and goes to great lengths to obfuscate how, and by whom, the Loan was made, attempting to deceive consumers into believing that they have no legal recourse against its enforcement.

**WHEREFORE,** Ms. Apolinar respectfully requests this Honorable Court enter judgment against the Defendants, jointly and severally, ordering:

a.    Threefold the amount of actual damages;

b.    Reasonable costs and attorneys' fees pursuant to 18 U.S.C § 1964(c);

c.    Any other relief this Court deems equitable and proper under the circumstances.

## COUNT IV
## DEFENDANTS' JOINT & SEVERAL VIOLATIONS OF
## RICO, 18 U.S.C. § 1962(c)

186.    Ms. Apolinar adopts and incorporates Paragraphs 1 – 171 as if fully restated herein.

187.   The Defendants, through their participation in the furtherance of the Blue Mountain Loans scheme, along with the Tribe, and other persons, natural and otherwise, constitute an *Enterprise* as defined by 18 U.S.C. § 1961(4).

188.   The Loan charged an interest rate far in excess of Florida's maximum permitted rate, and thus the Loan was an *Unlawful Debt* pursuant to 18 U.S.C. § 1961(6).

189.   The Defendants each associated with the enterprise and participated in the affairs of the enterprise as described in detail herein, which existed for the purpose of collection of unlawful debt.

190.   The Defendants' participation in the enterprise violated **18 U.S.C § 1962(c)** and caused Ms. Apolinar to repay an amount on the unlawful Loan.

**WHEREFORE,** Ms. Apolinar respectfully requests this Honorable Court enter judgment against the Defendants, jointly and severally, ordering:

a.   Threefold the amount of actual damages;

b.   Reasonable costs and attorneys' fees pursuant to 18 U.S.C § 1964(c);

c.   Any other relief this Court deems equitable and proper under the circumstances.

### COUNT V
### DEFENDANTS' JOINT & SEVERAL VIOLATIONS OF RICO, 18 U.S.C § 1962(d)

191.    Ms. Apolinar adopts and incorporates Paragraphs 1 – 171 as if fully restated herein.

192.    The Defendants, through their participation in the furtherance of the Blue Mountain Loans scheme, along with the Tribe, and other persons, natural and otherwise, constitute an *Enterprise* as defined by 18 U.S.C. § 1961(4).

193.    The Loan charged an interest rate far in excess of Florida's maximum permitted rate, and thus the Loan was an *Unlawful Debt* pursuant to 18 U.S.C. § 1961(6).

194.    The Defendants violated **18 U.S.C § 1962(d)** by conspiring with each other, and other entities and individuals, to issue and collect unlawful debts through Blue Mountain Loans.

195.    The Defendants were each aware of the goals of the enterprise and each took actions in furtherance of this conspiracy. For example, at various times, the Defendants have: (a) issued the Loan to Ms. Apolinar; (b) requested and obtained a consumer credit report regarding Ms. Apolinar; (c) designed and license software utilized by Blue Mountain to review Ms. Apolinar's eligibility for the Loan; (d) sold a consumer credit report regarding Ms. Apolinar to assist with review of her loan application; (e) initiated ACH deposits and withdrawals to and from Ms. Apolinar's bank account; and, (f) attempted collection of the Loan.

196.    The Defendants each agreed to participate in the conspiracy and agreed to the overall objective of the conspiracy – to collect unlawful loans through Blue Mountain Loans.

**WHEREFORE,** Ms. Apolinar respectfully requests this Honorable Court enter judgment against the Defendants, jointly and severally, ordering:

a.    Threefold the amount of actual damages;

b.    Reasonable costs and attorneys' fees pursuant to 18 U.S.C § 1964(c);

c.    Any other relief this Court deems equitable and proper under the circumstances.

### COUNT VI
### BLUE MOUNTAIN'S VIOLATIONS OF THE
### EFTA, 15 U.S.C. § 1693k(1)

197.    Ms. Apolinar adopts and incorporates paragraphs 1 – 171 as if fully stated herein.

198.    Blue Mountain conditioned the approval of a loan upon Ms. Apolinar agreeing to electronic payments, with her only real recourse being to modify such agreement after the loan was originated.

167.    Accordingly, Blue Mountain violated 15 U.S.C. § 1693k(1).

**WHEREFORE,** Ms. Apolinar respectfully requests this Honorable Court enter judgment against Blue Mountain, ordering:

a.     Statutory damages of $1,000.00, pursuant to 15 U.S.C. § 1693m(a)(2)(A);

b.     Reasonable costs and attorneys' fees, pursuant to 15 U.S.C. § 1693m(a)(2)(A); and,

c.     Such other relief that this Court deems just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

Ms. Apolinar hereby demands a jury trial on all issues so triable.

Respectfully submitted this July 19, 2024 by:

**SERAPH LEGAL, P. A.**

/s/ *Fethullah Gulen*
Fethullah Gulen, Esq.
Florida Bar Number: 1045392
FGulen@seraphlegal.com
2124 W Kennedy Blvd., Suite A
Tampa, FL 33606
Tel: 813-567-1230
Fax: 855-500-0705
*Counsel for Plaintiff*

**<u>ATTACHED EXHIBIT LIST</u>**

A     Ms. Apolinar's Loan Agreement, June 16, 2024 - Excerpt
B     Ms. Apolinar's Clarity Statement, June 29, 2024, Loan Tradeline - Excerpt
C     The Tribe's Lending Commission Ordinance - Excerpts
D     Homepage of www.bluemountainloans.com, Accessed July 16, 2024 - Excerpts
E     Homepage of www.americascashadvance.com, Accessed July 16, 2024 - Excerpts
F     Server Location of IP Address 169.55.60.156

G       Dustin Dernier Infinity Testimonial
H       John Humphrey Infinity Testimonial
I       Ms. Apolinar's Clarity Statement, June 29, 2024, Inquiry - Excerpt